The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oh yay, oh yay, oh yay. All persons have any amount of form of business before the Honorable United States Court of Appeals for the Fourth Circuit. I must adjourn now and give their attention for the Court is now sitting. God save the United States and its Honorable Court. All right, thank you. Be seated. Mr. Fuller, whenever you're ready. Thank you, Your Honor. May it please the Court, I'm Robert Fuller with Robinson Bradshaw and Henson representing the appellant Bassett Furniture here at the table with me are Nathan Chase, my colleague, and Jay Hervey who is in-house counsel at Bassett. This is a case that involves the purchase by Bassett of furniture from Colonial, which were baby cribs that Bassett had contracted to resell to babies or us. Colonial had the baby cribs manufactured in China under separate contracts. Bassett obtained a warranty from Colonial that the baby cribs would be 100% free of manufacturing and materials defects. The reason for this warranty, well there were several reasons. First of all, baby cribs are subject to Consumer Product Safety Commission regulation and even one defect in one crib can be a basis for the CPSC to require a recall. Secondly, the cribs are shipped in boxes, disassembled, and passed through to babies or us and generally assembled by the consumer. So as a practical matter, it's not economically possible to check every crib once you get it in a box and see if there's any defects. Third, while Bassett did some spot inspections in China to try to make sure there were no design problems with the cribs that would show up, they didn't inspect every crib in China. They put that contractual responsibility, or at least the serious defects. There were three different models. There were various different defects. Because of the time constraints here, because I don't think it's that important for the argument, I'm not going to go into detail. They're outlined in our brief and there's some pictures in the joint affix that help to understand the problem. As a result of the defects, Bassett had to do three Consumer Product Safety Commission supervised recalls, spend about two million dollars on the recalls. For one of the cribs, they had to send people into the home of every consumer that had a crib to see if it was defective and if so, fix it. For one of the cribs, they had to send out about 3,000 fixed kits to fix an arm problem. It was a fairly involved undertaking. They had to make some payments to babies or us. Ultimately, they lost their business relationship with babies or us, which was very significant. Bassett attempted to come to a resolution with Colonial, some kind of an arrangement where they would reduce the amount they paid Colonial by a small percentage for several years. That didn't work and finally, exercising their rights under a contractual provision in their purchase documents and their sort of omnibus general conditions, they began to back charge or charge back Colonial by deducting from payments that would otherwise be due Colonial for unrelated furniture their damages that they had incurred with respect to these three defective cribs. In other words, Bassett continued to buy furniture from Colonial. It happened to be baby furniture for babies or us. It wasn't defective, but because of the defects in the baby cribs, they charged back against the invoices for the non-effective furniture. Once Bassett began to do that, Colonial quit paying at least in full the Chinese manufacturers and there's some indication in the record that they told the manufacturers in China not to release the bills of lading so that which put Bassett in a bad way for us. They were scared of losing the relationship which turned out to be a well-founded fear. Bassett therefore, in an attempt to mitigate its damages and get its cribs, paid the Chinese factories to release the bills of lading. That resulted basically in this lawsuit with Colonial making largely claims for unpaid invoices. In their view, in Bassett's view, they were paid through chargebacks. In addition, there's some small amounts that were claimed for chargebacks and damages and then Colonial also asserted an unfair trade practice claim. Bassett asserted contractual claims for breach of the express warranty, breach of contract, and breach of implied warranties. When the case went to trial, the judge instructed the jury to consider the and indicated that if there was some amount awarded to both parties, he would reconcile the amounts in the judgment. In the jury verdict, the jury returned a verdict for Bassett on its breach of express warranty claim but not on its breach of contract or implied warranty claim, but the jury only awarded Bassett $1 in nominal damages. On the claims that Colonial was making, the jury returned a verdict for basically all the contract damages that Colonial was seeking, which was probably the only damages evidence that they put on. And in addition, and somewhat inexplicably, the record indicates that trial counsel couldn't figure out what the number was for, returned a verdict of $41,000 and some odd dollars on one of the seven, quote, unfair trade practice issues that the judge sent to the jury, which was the issue that asked whether or not or coercion. I'll speak to that more when I get to that part of the argument. I think those are the pertinent facts that your honors need to keep in mind as you're considering this case. Now, what are we here asking the court to do? Number one, we're asking for a new trial on Bassett's breach of contract, breach of express warranty, and breach of implied warranty claims, because we believe that errors in jury instructions that we call instruction 16, because that was proposed instruction 16, so badly infected the trial that Bassett was prejudiced and suffered an adverse outcome as a result of that. There's no question of what the jury was confused by this instruction, because they asked for clarification. And the judge really just told them, just follow the instructions I've already given you, which in and of itself is an error under the precedent that we cited in our trial, in our appellate brief, given that the judge is supposed to eliminate all doubt. Second, we're asking for the unfair trade practice award to Colonial to be reversed on any of several different theories, most of which would entitle us to a reversal with no right for Colonial to have a trial on the claim, and the last of which would not get to that issue. First of all, with respect to instruction 16 and our claims for breach of contract and breach of warranty, I want to walk through with your honors what instruction 16 told the juror. It's reproduced in the joint appendix at page 1041 and also at page 5 of our opening brief. Why don't you tell us first what your objection was with regard to that instruction to the district judge? Actually, trial counsel objected that it was misleading and confusing, and in addition, he talked for several pages about what he thought was wrong with the objection. If you read the totality of what he says in those several pages, he's operating under the assumption that it's obvious that you wouldn't only be limited to recovering damages for the specific cribs that are defective, because the warranty was a warranty that there wouldn't be any defects, and a lot of the costs that were incurred as a result of that breach of warranty were costs to go out and inspect cribs and consumers' homes and see if they were defective or to open boxes and see if they were defective. So, I believe that the trial counsel got the point across that this was an incorrect instruction, and in any event, I think it's so erroneous that it's that it's weren't sufficient. The first thing that the judge told the jury, and I'm going to quote here, quote, warranting a shipment to be without defects does not mean that each and every part of each and every crib would have no manufacturing defects. So, what he told the jury there was the warranty, the express warranty that there will be, that the cribs will be 100% free of manufacturing and materials defects doesn't mean what it says. Then he went on to say that because any crib of a specific model breaches a warranty doesn't mean that the purchaser is entitled to any and all those expenses related to all the cribs of that design. That if there's going to be a rejection of a shipment for non-conformity, the defect right must be higher than agreed upon or lacking specific agreement higher than the standard in the industry, and to the extent that Bassett has shown that specific cribs have manufacturing defects and will fail to meet the warranties, Bassett is entitled to damages for breach of warranty for such cribs. Mr. Fuller, the jury did find in your amount of damages, right? You didn't, the jury didn't disagree with you. It simply found that it simply didn't agree with what you are now claiming your damages for that breach should have reflected. That's right, Judge Duncan. With respect to the breach of express warranty claim, the instruction really prejudices with respect to damages by telling the jury that we can only cover damages for the specific cribs that were defective when by the nature of the warranty, what we were getting a warranty for in part was to keep us from having to go and inspect all the cribs and find out which ones were defective or and to keep from having to do a recall of all the cribs because some of them were defective, which is what CPSC requires. Is it your argument, and I may have been unclear about this, that that instructional error bleeds over into the breach contract? Yes, yes ma'am. It does because essentially what the judge told the jury here is that under no circumstances does warranting a shipment to be without defects mean that it's without defects and he also with respect to our merchant ability claim took away by this instruction the ability of the jury to reach the conclusion that a shipment of cribs with, as Jeff Bassett put it in his testimony, numerous random defects is not merchantable. There are some circumstances in which you could have some defects in a shipment, for example the goat skins or the shoes that are illustrated in the cases that are discussed in our brief, and that shipment might be merchantable. It's not a big deal to throw out a rotten goat skin once in a while. However, I submit to your honor that you couldn't have a shipment of searchable equipment or baby cribs or you know space heaters which were at issue in the QVC case and have any of them be materially defective and have them actually be merchantable because you've got a CPSC regulated product. You've got a danger of injury or death to babies. So I think it prejudiced on both fronts in that regard. I think I understand your response. The reason I'm a bit, the reason I asked the question is the jury awarded one dollar in damages. So it does not appear that they, it doesn't seem that they were confused on specific defects versus the universe of defects. Well your honor I think that they, my interpretation of it is that they were because there wasn't any particular evidence of which cribs were defective. And I don't know that that evidence could have been produced under these circumstances. And I think what happened here is the jury interpreted the instruction to require evidence that would be something like this. There were 10,000 of the recall one cribs and we know that 4,000 were defective and we shipped 3,000 fixed kits. But for the recall one cribs, they didn't have that kind of evidence and they would never have been able to develop it without actually visiting every consumer's home. So that's our fear and particularly when the jury asked this question and indicated they were confused. When I sat down, we were not trial counsel, when I sat down and read the transcript and read this instruction, I read it four or five times and that was my interpretation of what the judge was saying. And I really think it did seriously prejudice Bassett and affected the jury's view of the case by holding Bassett to a standard that really wasn't appropriate. And if Your Honor's questions indicates you understand the case very well, so I'm not going to dwell on this point except to note that the QVC case that's cited in our brief, while it's not a controlling authority, it's an Eastern District or Pennsylvania District Court case, I think it's very well reasoned and it's helpful and useful in that way and I'd call your attention to that. If I could spend just a moment on the unfair trade practice. The problem that we see with the unfair trade practice claim and the judge's decision to allow it to proceed, well in North Carolina, as Your Honor's know, the jury finds facts and then the judge makes a legal conclusion whether there is an unfair trade practice. Here, the judge erred for several reasons. First, Broussard v. Monarchy, this court's clear precedent, holds that you can't turn a contract action into a tort action. And all the relief that was sought here, failure to pay invoices, failure to provide cribs, right to back charge, all of that is essentially contractual. This was a basically contractual dispute. In the Monarchy case, there were findings by the jury that Monarchy had engaged in tortious interference and fraud and all kinds of things and nevertheless, this court held under North Carolina unfair trade practice law, you can't have an unfair trade practice in that circumstance. But it seemed to me at least arguable that the conduct that was being challenged was quite different under the unfair and deceptive trade practices claim. Colonial was contending that you interacted with the Chinese buyers and paid them more to engage in a relationship directly with Bassett and undercut Colonial. So that's not a contractually based claim, is it? Your Honor, I think if it's not properly analyzed, it is, because it turns on whether or not there was actually a breach here. If Colonial was actually in breach and would not release the furniture because of Bassett's valid back charges, then Bassett had the opportunity and actually the obligation to mitigate its damages. Really the only way to do it was to make payments to the Chinese factories to get the bills laid and released. So I think it's really part and parcel of the contractual dispute. In addition, there was no long-term contract here with Colonial and there's no legal principle that I'm aware of that was ever cited in the case that would prevent Bassett from buying directly from Chinese factories. So this wasn't a tortious interference situation properly analyzed. It all was part and parcel of the contract and if it's compared to the Meineke case, it's certainly materially similar to that case. I'd also point out that the actual only finding that was the basis for anything more than a jury issue was based on a jury issue about robbery and coercion. And as the cases that we saw in our brief indicate, this was not commercial robbery. The cases in North Carolina that allow unfair fraud practice claims to proceed for commercial robbery are cases where there is essentially, there's a violation of the North Carolina commercial robbery statute which requires a payment to an agent of another. So if a record company pays a disc jockey to play their tunes on the on the radio, the old payola cases, that's commercial robbery. If Mr. Hendrick pays Honda to give him a bigger allocation of cars, which was a famous case in North Carolina a few years ago, that's commercial robbery. This is not commercial robbery. This is going to an independent party who only has a contractual relationship with Bassett. And there was no coercion of, I mean, only has an independent contractual relationship with Colonial. And there was no coercion here of Colonial at all. So that that doesn't make any sense. Finally, and I'm seeing my time is almost up, we'd submit that is a you can finish if you want to. I've got 16 seconds or oh it is oh I'm sorry it started counting back off. I apologize. That's all right, you can shut up. We'd also submit that instruction 16 prejudice Bassett on the unfair trade practice claim because all of those issues were so incredibly intertwined with the contract issues that it colored the jury's way of looking at that claim. And then at the very least we'd be entitled to a new trial here. I'm sorry I didn't notice. I didn't let it count it backwards. A few minutes remaining. Ms. Allison. Good morning. My name is June Allison. I'm with the firm of Wishart Norris in Charlotte, North Carolina and we are representing Colonial Trading Company. I'm here with my partner Pam Duffy from our Burlington office and our associate Rachel Blunk is also at our table. Also present in the courtroom today are two of the three principals of Colonial Trading and they are the Boggs family and unfortunately the elder Mr. Boggs was killed today and not able to make this. It's really a sad day for many reasons but this case is very dear to me and it's one I believe in very strongly. Appellant raises four issues on this appeal. I would like to address the first two regarding the court's instructions to the jury and the jury's findings. My partner Pam Duffy will be discussing the court practice's issues. As you've heard from Mr. Fuller, Bassett's appeal here rests on the four sentences in the instructions that we're calling instruction number 16. Bassett claims with respect to this instruction first that they raise a proper objection, secondly that this is an erroneous statement of the law, and third these four sentences were of such a magnitude, the error was so great that somehow it infected the jury's deliberation on every single issue found against Bassett and on the one issue that they found in Bassett's favor, it infected their damages claim. They're also saying these four sentences taking out of context of some comprehensive instructions also affected the jury's findings for Colonial on the unfair and deceptive trade practices. We said facts in this case don't bear this out. Bassett has always been involved in a different case than we've been involved in and the facts as Mr. Fuller presented them, yes are Bassett's versions of facts, but Colonial presented a very different picture to the jury and one that the jury accepted. First I'd like to say that we do not think the objection was proper. The objection was raised not specific enough to preserve, not distinct and specific enough. He basically says this is confusing and then he launches in, he being Bassett's counsel at trial, into a lengthy discussion about offsetting damages, etc. and while the court may have understood it, that is certainly not clear on the record and he certainly did not articulate that in a way that Mr. Fuller does on brief. In support of their assertion that just to say an instruction or potential instruction is confusing is sufficient, they cited eighth circuit case which is Bauer versus Curators and indeed there the counsel did say that's a confusing instruction and the court nevertheless considered it, but the distinction was there that the court looked at the interchange between counsel and court and said okay from the context here we can clearly see that the judge knew exactly what he meant, took it into consideration, decided to give it anyway. And the court went on to say the judge was wrong about that, he should not have given it, but the error in the context of the instructions as a whole was not error that should be more on reversal. Secondly we don't think this instruction was an error of law. When I was preparing for this trial and I'm looking at this warranty that says 100% no defects in a manufactured product, I'm thinking this has got to have come up in other contexts in other courts because this is often a warranty that sellers, buyers of goods and resell them wish to have and I said how have the courts treated this? So I did a little research and the case I came up with was a First Circuit case now which was the strongest on the facts and the court there was looking at shoes and it says just because in a lot of shoes, a whole lot of shoes, you find a couple of defects doesn't mean you get to revoke the whole lot unless those defects are substantial. In that case they talked about the standards in the industry, but really that's the same thing as saying unless those defects substantially affect the value of the whole lot to you, the buyer, and otherwise you just get your proper damages for breach of warranty. Well that's precisely the language of 2-608 on revocation of exemptions. Excuse me, doesn't the invoice Colonial submitted to Bassett warrant that its product would be 100% free of manufacturing defects? Absolutely. Does NAP recognize that? Yes, in fact that was also a specific warranty case in which the court they had warranted the goods will be without defect and the court is basically saying the point is if you buy 100 widgets from me and I want them to be without defect and you accept them after inspection, you don't get to revoke acceptance of the whole lot just because you find one that's defective. It has to impair the value of that lot to you and that's again exactly what 2-608 says. In contrast to the NAP case, they cite QVC and of course that's a case that came out after this case was tried last summer and I don't think those cases are inconsistent but what is inconsistent are the facts of the case. In QVC the court made a specific finding that the buyer had revoked acceptance properly, timely, etc. In our case in contrast the jury found that Bassett did not justifiably revoke acceptance and I think that was properly said based on the evidence that was presented to them. Also in QVC the court said that experts for both parties testified that there were latent defects in the goods and that they were very hard to participate in the quality and control and inspection process. In short contrast here despite what Bassett argues now, if you look at their contract including their quality control procedures, Bassett was integrally involved in every step of quality control. The goods could not leave China until they had been inspected by Bassett, that they had gone through an audit, a rigorous checklist and indeed independent third-party testing. So there was quite a lot of evidence here that there was no defect in the goods, in fact certainly not of the sort that would impair their value. So again latent defects, revocation of acceptance, not present in that case. Lastly I don't think it prejudices the jury at all. The jury heard all the evidence over eight days, it saw examples of the cribs and Bassett's own quality control manager in Asia testified as to why these goods did not in fact have manufacturing defects despite what was said by Bassett. So your contention is there was nothing wrong with the cribs at all? In terms of a lot being defective. You said a lot? You mean many? Yes. No, I mean any. Was there probably a crib that had a defect? Yes. All right. But a defect does not necessarily mean that the crib is therefore hazardous or the crib is worthy of repo. A manufacturing defect could be something as small as a stain, the wrong stain to put on it. That's a manufacturing defect. That wasn't the case here. That was not the case here. It was here. Here it did relate to safety, did it not? I do not think so, Your Honor. So the Consumer Protection just sort of decided just to do it just for. Bassett submitted the goods for a voluntary recall as the court and QBC noted. As they should. Of course they should, but the CPSC made no independent judgment. In fact, what I think was important to the jury is if you contrast what Bassett specifically reported on its official forms to the CPSC about the goods and their danger and what they're saying today and said to the jury, those things are diametrically opposed. Diametrically opposed. What did the jury say? What did the jury say? They said an express warranty had been breached. They did not say what express warranty had been breached. It could have been the warranty that they felt made specifications in some way, shape, or form. And there was actually an example of that presented. And how could the damage for that one defect be one dollar? Well, very simply, the judge's instructions were, if you find a breach of warranty, then at minimum, without even any proof, the buyer's entitled to nominal damages, and you must award them a nominal sum. They are also entitled to such damages as they prove to you with a reasonable certainty that were factual, that were incidental and consequential. Bassett simply failed to prove its damages. It gave out all these wild numbers without any backup. Indeed, there was a lot of challenge to those numbers. And the fact, once again, that- You disputed that they sent the kits out? No, I don't dispute they sent the kits out. You disputed that they made investigations as to those crips? I do not. But the jury says one dollar was the damage? That's correct, Your Honor, because they failed to show any proximate cause between the actions they took and the damages they incurred, and any action or failure to act properly on the part of Colonial. Okay. Thank you, Ms. Allison. Let's hear from Ms. Duffy. May it please the Court, Pamela Duffy here for the plaintiff. I'd like to turn attention to the Unfair Trade Practice claim. I would like to follow up and answer to Judge Gregory. In the jury verdict, there was a finding by the jury that the plaintiff had not failed or had not provided goods, sorry, had not failed to perform or failed to deliver or tender conforming goods. So, in other words, the jury did find that the goods were conforming. Did you say that? I couldn't hear you. So sorry, I garbled that. In 1C on the verdict form for Bassett's counterclaim, the jury answered no to the question of whether Colonial had failed to perform or deliver or tender conforming goods. 1C? 1A, 1C, A. So that's inconsistent with the finding of and a breach of and express warranty, isn't it? There were other warranties, and it wasn't specified which one. But what they did say is that the goods were conforming. Well, the goods would be the only requirement that Colonial would have. They say with respect to providing those goods, there was no breach. So how would there be a breach of and express warranty anywhere? Because there were other express warranties in terms of their own ages. Even so, it said none. Colonial didn't do anything wrong in that finding. So how is that not inconsistent with finding a breach of an express warranty? It's inconsistent. We contend it's not, Your Honor, because there were other express warranties. Okay. I'm looking at 1C, A, I think, and it refers to failing to pay invoices when due. Or am I looking at both? It's a verdict form for Bassett's counterclaim, Your Honor. It's a different verdict form. Okay. Thank you. Turning to the unfair trade practice claim, it was asserted during Mr. Fuller's argument that there's no legal prohibition for Bassett to deal directly and purchase directly from suppliers. And that statement in and of itself is true. But that's not what was presented here. There was additional evidence which casts a different light. What we have here is Colonial was a middleman that had a longstanding relationship with suppliers in supplying goods to Bassett. There was a course of conduct in which Bassett decided that it wanted to cut out the cost of the middleman and deal directly with the suppliers. But the suppliers would not agree to do that. And there were several instances in which the suppliers wouldn't agree to do it until Bassett put financial pressure on Colonial to prevent Colonial's ability to pay those suppliers, and also until Bassett went to those suppliers and offered them a financial inducement that had nothing to do with what they were actually owed in order to convince them to deal directly with Bassett. So that presents a different scenario than simply dealing directly with a supplier. In short, beginning at about fall of 07, there was a plan to basically muscle Colonial out of this arrangement and a plan to use the recall charges, many of them falsified, as leverage to muscle Colonial out of the deal. So with that background, I'd like to turn to the assertions that are made by the appellant in this case. The unfair trade practice claim is challenged on three crowns, the Broussard case and its progeny, the assertion that these are duplicative of the contract claims, and also the Instruction 16. Talking first about the Broussard case, this case is not a mere breach of contract. It's more than simply an intentional breach. This is a breach of contract accompanied by substantial aggravating circumstances that the jury answered in specific questions in issue number three. Those answers given by the jury reflect the breach of contract was accompanied by aggravating conduct, which included entering into a contract without intent to perform it, deceitful conduct, including offering false justifications for charge backs, inequitable assertions of power, coercion, bribery, and tortious interference, all with the intent, as reflected in the answer to issue 3B on the Colonial verdict form, all with the intent to interfere with Colonial supplier relationships. And as the court noted in Dealer's Supply, what you do is you look to the acts. It's not the fact that there's a contractual relationship. You look to what the acts are of the defendant. And in making that observation, that court relied on the Fourth Circuit's opinion in South Atlantic v. Reese. By nature— Let me ask you a question. This is probably no great practical import, but nevertheless, something I personally need to clear up. The damages that were awarded pursuant—the findings that were made, the damages of $1 that were awarded on issue 3, on 3A, B, C, and D, why aren't those issues more properly considered with regard to the breach of contract action? These are ordering goods they didn't intend to pay, using a false justification that they were defective, things like that. Broussard makes it, I think, pretty clear that we really don't want to convert really breach of contract actions into false claims. And these particular ones, 3A, B, C, and D, seem to me to be breach of contract-type issues as opposed—now, I know it's not a great consequence. It's only $1 apiece, but the principle of it concerns me. Well, Your Honor, I think the same conduct can form the basis of a breach of contract claim and an unfair trade practice claim. But mere breach is not enough to get to the Chapter 75. And so, for example, taking the instance of ordering or receiving goods without intent to pay, there's a line of cases that says if—this is not simply just intentionally breaching. What this means is if you enter into a contract without intent to pay, that's essentially deceptive conduct. In the Williams case, for example, which was a fraud case, not an unfair trade practice case, but, of course, fraud can be a basis for unfair trade practice. A promise made fraudulently, i.e. without intent to carry it out, is tortious. It's beyond breach of contract. In the Gilbane case, which is a Fourth Circuit case from 1996, the court stated a broken promise is an unfair trade practice only if the defendant had no intent to perform it at the time you made the promise. I'm going to cut you off, not because I disagree with what you're saying, but this is a minor issue, and you probably need to use your time more effectively on another issue. Well, I mean, I think it is important to note the sort of series of conduct, and even though only a dollar of damages was awarded on all but one of those, it establishes a picture of that conduct. So it's your client's position that Bassett completely, on a whole call, fabricated this defect in the recall? That was the position at trial? Your Honor, the position at trial was there was a recall. There were recall expenses that were charged back to our client, much of which had been paid. But the issue here was that Bassett, in dealing with this recall, which was a voluntary recall, had represented to the regulatory authorities that there were slight deviations. That Bassett had received no reports of accidents or injuries. That there was maybe a variance of 1.23 millimeters on recall number two between two spindles on a single crib. And there's also evidence that that was really a design issue that would lie with Bassett as opposed to lying with Colonial. And Bassett also represented that the nature of injury or possible injury with the product defect, Bassett responded to that question, none. And so that's in direct contrast, for example, to the QVC case that was mentioned earlier in earlier arguments, where there was a substantial problem, a substantial hazard associated with the heaters. So turning quickly to the issue that was awarded for the 41,000 or so in damages, and if I just finish my sentence, I realize I'm coming out of time. Yeah, finish. Go ahead and finish your sentence. That there was evidence here of coercion and bribery. And we don't have to show commercial bribery. There's nothing in the unfair trade practice statute or case law that requires the showing of a crime. But basically, Judge Voorhees, in his October opinion, and there's a footnote where he mentions this, that these suppliers would not have stopped, would not have started dealing directly with Bassett absent this improper payment, and that there was financial coercion imposed on Colonial, which prevented it from being able to make payments to suppliers. Thank you. Thank you, Ms. Duffy. Mr. Fuller? I just want to hit a couple of points. First of all- I have a question, please. It seems to me that your argument hinges to a considerable extent on your factual assertion that the cribs were defective. Is that correct? Yes, Your Honor. I believe we have a right to- Could I just- I'm sorry, I thought that was a good question. That wasn't my question, if I may. And you can incorporate all of this into your response. Can you point me to a finding, a fact of the jury in that regard? The jury found that there was an express- the express warranty was breached, and contrary to what counsel for Colonial indicated, this was the only express warranty that was argued and that was at issue in the case. If you would- If I can, though, that finding of yes with respect to the breach of an express warranty does coexist with the finding that it appears to be found that Colonial did not fail to perform or deliver or tender conforming goods. I think that what happened there was the jury was confused by Instruction 16, which said that 100% warranty doesn't mean 100% warranty. So they said, oh, well, they didn't deliver nonconforming goods. But then when they looked at the question about did they breach an express warranty, they said, yeah, they breached an express warranty. And I think that that's the reason that we're entitled under the cases that we cited in our reply brief to construe the evidence in our favor on appeal here with respect to whether the cribs were defective. If you look at the cases that are cited in our reply brief at the top of page 6, they talk about that. And here, where you have a erroneous instruction, you have at least one finding that is consistent with the cribs being defective. I think we're entitled to the benefit of the doubt there. I think my time is run, but if I could indulge the Court and make a couple of quick points that I think might help the Court. First of all, the idea that we told the CPSC that there was nothing wrong with these cribs is complete malarkey. If you read the whole record, what happened is the first thing that Bassett told the CPSC was we thought that there was a certain problem. It turned out that was incorrect. We were passing on information that Colonial gave us. And if you look at the joint appendix, page 590-92 and page 709-711, that will explain why our argument is wrong. The cribs were, in fact, there's overwhelming evidence that these cribs had numerous random defects. The basic problem with the arguments that Colonial has made is that they're seeking to argue that there's nothing wrong with the jury instruction because the jury found for them. But that's a tautological nullity. The reason the jury found for them, by our way of thinking, is that there was something wrong with the jury instruction. And the issue here is an issue of law. And we respectfully request a new trial because we think there was a substantial miscarriage of justice here. And given the jury's question to the judge about what does this instruction mean and the failure to answer it, I think that we got the wrong result. Thank you, Your Honor. Thank you, Mr. Fuller. Ms. Allison. Ms. Allison, I'm sorry, but would you be able to respond? There are just two things that would be helpful to me if I may. One is there was only one express warranty at issue here. That's not correct, Your Honor. And OK, can you support that? Sure. The express warranties here were that there would be a 100% free of raw material and that they would conform to express samples or models that were always made and shown to Bassett before the crib was ever manufactured. And there was another warranty about making sure you had all the clearances from China, et cetera, to get those into the country. And that's part of the process of getting this independent third-party testing. So those were all express warranties. And I did want to say that what Bassett is asking you to do is assume a lot. And that is to assume that the warranty was the one breached was of 100% free of manufacturing defects. Second, that the express warranty the jury found was a material one. They were explaining materiality. You didn't ask the court to sever those out, did you, for a specific finding? No, we did not. Well, then maybe you bore the brunt of not specifying that there could be any or all of them. Could be. Well, you did. OK, let's make sure. Could be. But they're also asking you to assume that whatever that warranty was, that it renders the crib not only defective but hazardous. But we don't think any of that's true. Because a big problem for Bassett, he puts in evidence, was their lack of evidence. Unlike the QVC case, they presented no testimony of any consumer, no testimony of any customer, no testimony of any expert witness on either Consumer Product Safety Commission standards and requirements or the defects in these cribs. No evidence of an expert about the defects in this crib. They have an engineering and design department. They did not even present anyone from that department to testify to these defects. The person that testified the most clearly about these cribs was Bassett's employee in China, who is the person who signed off on them, who audited them, who watched the process, who is qualified in ASTM testing. He said, there's no question in my mind these goods had no manufacturing defects. The first one was use of a bolt specified by Bassett in its design, which if over-tightened could come loose. That's exactly what happened. Bassett made the decision to send farm kits unilaterally. Unlike QVC, they didn't send any cribs out for third-party testing after there was a problem. They didn't hire any experts. They just made a decision about what they were going to do and did it without consulting in any way, shape, or form with Colonial, except to ask for them to pay for everything, of course. The second one, there were only 18 cribs sold. Two fell apart from a floor display model. On the third one, clearly a design defect, which Colonial warned them about up front. Their own man in China, familiar with standards, said, don't make it this way. You're always going to have problems with bowing and flexing. Sure enough, that was the problem, some bowing and flexing. So they were warned about that, but now they want to go ahead and make the decision to go forth and yet hold us accountable. At the end of the day, these were comprehensive instructions. The judge talked about the express warranties claimed, all of them. Talked about materiality. It talked about what is a warranty that impairs the whole value of it to you. This was a smart jury. The court noted that the jury's verdict was not inconsistent, nor did they ever object to the jury's verdict. The court pulled us aside, talked about it, said, you see the inconsistencies? Nobody had a word to say. Okay, thank you, Ms. Allison. Thank you. We'll come down and re-counsel and then go into our next case.
judges: William B. Traxler Jr., Roger L. Gregory, Allyson K. Duncan